[No. C057995. Third Dist. June 2, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL EUGENE JAMES, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts I and II of the Discussion.

COUNSEL

Laurie Wilmore, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette and Michael P. Farrell, Assistant Attorneys General, David A. Rhodes and Michael Dolida, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**SIMS, J.**—In this case, we hold that possession of an assault weapon in California remains unlawful and is not protected by the Second Amendment to the federal Constitution as construed by the United States Supreme Court in *District of Columbia v. Heller* (2008) 554 U.S. ___ [171 L.Ed.2d 657, 128 S.Ct. 2783] (*Heller*).[1]

Defendant Michael Eugene James was convicted by jury of three counts of unlawful possession of an assault weapon (Pen. Code, § 12280, subd. (b)),[2] one count of unlawful possession of a .50-caliber BMG rifle (§ 12280, subd. (c)), 10 counts of unlawful possession of a firearm (§ 12021,

---

[1] The Second Amendment to the Constitution of the United States provides, "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."

[2] Undesignated statutory references are to the Penal Code.

subd. (g)(2)), and one count of unlawful possession of a blowgun (§ 12582). The trial court sentenced defendant to two years in state prison and imposed other orders. On appeal, defendant asserts two claims of instructional error and further asserts that his right to bear arms under the Second Amendment to the United States Constitution has been violated.

In the unpublished portion of the opinion, we reject his claims of prejudicial instructional error. In the published portion, we reject his Second Amendment claim. We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

In May of 2006, Special Agent John Marsh of the California Department of Justice began investigating defendant for possible firearms violations. Special Agent Marsh discovered that a restraining order had been issued against defendant, expressly prohibiting defendant from possessing firearms. The restraining order further directed defendant to "turn in or sell" all firearms in his possession by a certain date. Upon receiving this information, Marsh consulted the Automated Firearms System (AFS) database and discovered that defendant had roughly 20 firearms registered to his name. Marsh then contacted defendant by phone; defendant explained that all of his firearms had been turned in to the Sacramento Police Department. A comparison of the AFS database with the list of weapons turned in to police revealed 10 outstanding firearms.

In an attempt to clear up the discrepancy, Special Agent Marsh again contacted defendant by phone. During this conversation, defendant walked around his house and informed Marsh that he had found two additional firearms. When Marsh arrived at defendant's house to retrieve the newly discovered guns, he found four firearms (including two assault weapons) stacked on the floor near the front door. Defendant explained that he had found two more while Marsh was en route. The specifics of these firearms are as follows: (1) Bushmaster XM-15 assault weapon; (2) Professional Ordnance Carbon 15 assault pistol; (3) Keltec P-32 handgun; and (4) Dan Wesson Arms .357 revolver. After confiscating the weapons, Marsh explained to defendant that according to the AFS records there were still a number of firearms that had not been turned in. Defendant refused Marsh's request to search the house for the remaining guns.

Shortly after leaving defendant's house, Special Agent Marsh realized that he left behind a working file and returned to retrieve it. Marsh arrived to find that defendant had found another gun. This firearm, a Kobray PM-11 handgun, was also confiscated.

Notwithstanding the weapons turned in to the Sacramento Police Department, and the five weapons taken by Special Agent Marsh during the two trips to defendant's house, there were still a number of firearms registered to defendant that had not been turned in. Marsh returned two days later with a search warrant. An Armalite AR-50 .50-caliber BMG rifle was found in its original box on a shelf in the garage. An Eagle Arms AR-15 lower receiver, and a DPMS AR-15 lower receiver, were also found in a box in the garage. An Eagle Flight blowgun and darts were found on a shelf in the garage. A 1911 Springfield .45-caliber semiautomatic handgun, and a Remington 12-gauge shotgun, were found next to the front door.

Defendant told Marsh that he did not turn in the .50-caliber BMG because he knew that he did not register it and if he turned it in, then he could get in trouble. Defendant said he thought he had turned all the other guns in.

Defendant was charged with three counts of unlawful possession of an assault weapon (counts 1, 2 & 4), one count of unlawful possession of a .50-caliber BMG rifle (count 3), 10 counts of unlawful possession of a firearm (counts 5–14), and one count of unlawful possession of a blowgun (count 15). He was tried by a jury. At the conclusion of Agent Marsh's testimony (and before the jury was instructed), the trial court entertained questions from the jurors. The record reflects the following:

"[THE COURT:] There was another question to the effect regarding the laws that apply if Mr. Johnson [sic] had honestly forgotten that he was in possession of the confiscated weapons, is that possession still illegal? [¶] That's not necessarily within the province of this witness to answer, but that issue will be addressed in the instructions of law and the arguments that the attorneys make so that will be made clearer for you."

Defendant was convicted on all counts, and sentenced to an aggregate term of two years in state prison (the middle term of two years on counts 1, 2 and 4; sentence on counts 2 and 4 to run concurrently to count 1), such term to run consecutively to two one-year terms in the county jail on counts 3 and 7 (custody credits to be applied to these county jail terms), plus a concurrent

term of one year in the county jail on the remaining 10 counts of unlawful possession of a firearm (counts 5–6 & 9–14) and unlawful possession of a blowgun (count 15).

## DISCUSSION

### I, II*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III

█ Defendant's final contention on appeal is that section 12280, subdivisions (b) and (c), prohibiting possession of an assault weapon or .50-caliber BMG rifle, violated his right to bear arms under the Second Amendment to the United States Constitution. Defendant relies on language in *Heller, supra*, 554 U.S. ___ [171 L.Ed.2d 637], "indicating that the Second Amendment is a pre-existing right of the individual and that military type weapons were the type originally sought to be protected."[4] Defendant's reading of *Heller* does not withstand scrutiny.

### A

█ Section 12280 was enacted by the Legislature as part of the Roberti-Roos Assault Weapons Control Act of 1989. (Stats. 1989, ch. 19, § 3, p. 67.) Subdivision (b) provides in relevant part: "Any person who, within this state, possesses any assault weapon, except as provided in this chapter, shall be punished by imprisonment in a county jail for a period not exceeding one year, or by imprisonment in the state prison." Section 12276, also enacted as

---

*See footnote, *ante*, page 662.

[4] While defendant acknowledges that the Second Amendment has not been held to apply to the states through the Fourteenth Amendment (see *United States v. Cruikshank et al.* (1875) 92 U.S. 542, 553 [23 L.Ed. 588], cited with approval in *Heller, supra*, 554 U.S. at p. ___ [128 S.Ct. at pp. 2812–2813]; *United States v. Fincher* (8th Cir. 2008) 538 F.3d 868, 873, fn. 2 ["We note that the Supreme Court did not address the question whether the Second Amendment is incorporated through the Fourteenth Amendment and thus applicable to the states."]), he "anticipates" that the Second Amendment will be incorporated, and raises the issue in order "to exhaust state remedies and preserve his right to federal review." Since we hold that defendant's right to bear arms was not infringed by section 12280, subdivisions (b) and (c), we do not address the incorporation issue.

part of the assault weapons control act, defines "assault weapon" by providing a list of proscribed weapons.[5] Section 12276.1 was enacted by the

---

[5] Section 12276 provides in full:

"As used in this chapter, 'assault weapon' shall mean the following designated semiautomatic firearms:

"(a) All of the following specified rifles:

"(1) All AK series including, but not limited to, the models identified as follows:

"(A) Made in China AK, AKM, AKS, AK47, AK47S, 56, 56S, 84S, and 86S.

"(B) Norinco 56, 56S, 84S, and 86S.

"(C) Poly Technologies AKS and AK47.

"(D) MAADI AK47 and ARM.

"(2) UZI and Galil.

"(3) Beretta AR-70.

"(4) CETME Sporter.

"(5) Colt AR-15 series.

"(6) Daewoo K-1, K-2, Max 1, Max 2, AR 100, and AR 110C.

"(7) Fabrique Nationale FAL, LAR, FNC, 308 Match, and Sporter.

"(8) MAS 223.

"(9) HK-91, HK-93, HK-94, and HK-PSG-1.

"(10) The following MAC types:

"(A) RPB Industries Inc. sM10 and sM11.

"(B) SWD Incorporated M11.

"(11) SKS with detachable magazine.

"(12) SIG AMT, PE-57, SG 550, and SG 551.

"(13) Springfield Armory BM59 and SAR-48.

"(14) Sterling MK-6.

"(15) Steyer AUG.

"(16) Valmet M62S, M71S, and M78S.

"(17) Armalite AR-180.

"(18) Bushmaster Assault Rifle.

"(19) Calico M-900.

"(20) J&R ENG M-68.

"(21) Weaver Arms Nighthawk.

"(b) All of the following specified pistols:

"(1) UZI.

"(2) Encom MP-9 and MP-45.

"(3) The following MAC types:

"(A) RPB Industries Inc. sM10 and sM11.

"(B) SWD Incorporated M-11.

"(C) Advance Armament Inc. M-11.

"(D) Military Armament Corp. Ingram M-11.

"(4) Intratec TEC-9.

"(5) Sites Spectre.

"(6) Sterling MK-7.

"(7) Calico M-950.

"(8) Bushmaster Pistol.

"(c) All of the following specified shotguns:

"(1) Franchi SPAS 12 and LAW 12.

"(2) Striker 12.

"(3) The Streetsweeper type S/S Inc. SS/12.

Legislature in 2000 and further defines "assault weapon" by the characteristics which render these weapons more dangerous than ordinary weapons typically possessed by law-abiding citizens for lawful purposes.[6]

Section 12280, subdivision (c), was enacted as part of the .50 Caliber BMG Regulation Act of 2004 (Stats. 2004, ch. 494, § 8), and provides in relevant part: "Any person who, within this state, possesses any .50 BMG rifle, except as provided in this chapter, shall be punished by a fine of one

"(d) Any firearm declared by the court pursuant to Section 12276.5 to be an assault weapon that is specified as an assault weapon in a list promulgated pursuant to Section 12276.5.

"(e) The term 'series' includes all other models that are only variations, with minor differences, of those models listed in subdivision (a), regardless of the manufacturer.

"(f) This section is declaratory of existing law, as amended, and a clarification of the law and the Legislature's intent which bans the weapons enumerated in this section, the weapons included in the list promulgated by the Attorney General pursuant to Section 12276.5, and any other models which are only variations of those weapons with minor differences, regardless of the manufacturer. The Legislature has defined assault weapons as the types, series, and models listed in this section because it was the most effective way to identify and restrict a specific class of semiautomatic weapons."

[6] Section 12276.1, subdivision (a) provides:

"Notwithstanding Section 12276, 'assault weapon' shall also mean any of the following:

"(1) A semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine and any one of the following:

"(A) A pistol grip that protrudes conspicuously beneath the action of the weapon.

"(B) A thumbhole stock.

"(C) A folding or telescoping stock.

"(D) A grenade launcher or flare launcher.

"(E) A flash suppressor.

"(F) A forward pistol grip.

"(2) A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds.

"(3) A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

"(4) A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the following:

"(A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer.

"(B) A second handgrip.

"(C) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning his or her hand, except a slide that encloses the barrel.

"(D) The capacity to accept a detachable magazine at some location outside of the pistol grip.

"(5) A semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

"(6) A semiautomatic shotgun that has both of the following:

"(A) A folding or telescoping stock.

"(B) A pistol grip that protrudes conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip.

"(7) A semiautomatic shotgun that has the ability to accept a detachable magazine.

"(8) Any shotgun with a revolving cylinder."

thousand dollars ($1,000), imprisonment in a county jail for a period not to exceed one year, or by both that fine and imprisonment."

In section 12275.5, the Legislature codified its findings, declarations, and legislative intent behind the Roberti-Roos Assault Weapons Control Act of 1989 and the .50 Caliber BMG Regulation Act of 2004: "(a) The Legislature hereby finds and declares that *the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state. The Legislature has restricted the assault weapons specified in Section 12276 based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings.* It is the intent of the Legislature in enacting this chapter to place restrictions on the use of assault weapons and to establish a registration and permit procedure for their lawful sale and possession. It is not, however, the intent of the Legislature by this chapter to place restrictions on the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities. [¶] (b) The Legislature hereby finds and declares that *the proliferation and use of .50 BMG rifles, as defined in Section 12278, poses a clear and present terrorist threat to the health, safety, and security of all residents of, and visitors to, this state, based upon findings that those firearms have such a high capacity for long distance and highly destructive firepower that they pose an unacceptable risk to the death and serious injury of human beings, destruction or serious damage of vital public and private buildings, civilian, police and military vehicles, power generation and transmission facilities, petrochemical production and storage facilities, and transportation infrastructure.* It is the intent of the Legislature in enacting this chapter to place restrictions on the use of these rifles and to establish a registration and permit procedure for their lawful sale and possession." (Italics added.)

In *Kasler v. Lockyer* (2000) 23 Cal.4th 472 [97 Cal.Rptr.2d 334, 2 P.3d 581] (*Kasler*), our Supreme Court reviewed the historical context of the assault weapons control act and provided a detailed analysis of its legislative history. As the court explained, the Legislature was motivated by "[t]he crisis created by the proliferation and use of assault weapons." (*Id.* at p. 482.) The "crisis" was summed up by Speaker of the Assembly Willie L. Brown, speaking to the Assembly, meeting as a Committee of the Whole: " 'The shooting incident in Stockton, the drive-by shootings that have been going on in Southern California at an alarming rate, the number of police officers who have been the victims of semi-automatic weapons, and the "stats" that now show the alarming group of arrests that are taking place, and when items are confiscated, on many, many occasions those items have turned out to be semi-automatic weapons. A combination of all those things, plus the volume of editorials, the volume of public comment out there about the question,

requires us to address the issues.' [Citation.]" (*Id.* at pp. 482–483, quoting 1 Assem. J. (1989–1990 Reg. Sess.) pp. 436–437.)

The court then placed Speaker Brown's comments in context: "The 'shooting incident in Stockton' to which Speaker Brown alluded had occurred at the Cleveland Elementary School in Stockton, California, the month before the meeting of the Committee of the Whole. While 300 pupils, mostly kindergartners through third graders, were enjoying their lunchtime recess, Patrick Purdy, who had placed plugs in his ears to dull the sounds of what he was about to do, drove up to the rear of the school and stepped out of his car carrying a Chinese-made semiautomatic AK-47. 'Impassively, Purdy squeezed the trigger of his rifle, then reloaded, raking the yard with at least 106 bullets. As children screamed in pain and fear, Purdy placed a 9-mm pistol to his head and killed himself. When the four-minute assault was over, five children, ages 6 to 9, were dead. One teacher and 29 pupils were wounded.' [Citation.]" (*Kasler, supra,* 23 Cal.4th at p. 483.)

The court also reviewed the horrific facts of a shooting incident at a San Ysidro McDonald's restaurant that occurred five years earlier in which James Huberty killed 21 people and wounded 15 others with assault weapons fire: "Stepping into the restaurant with a 9-millimeter Browning automatic pistol in his belt and a 12-gauge shotgun and a 9-millimeter UZI semiautomatic rifle slung over his shoulders, Huberty called out, ' "Everybody on the floor." About 45 patrons were present. As they scrambled to comply, Huberty marched around the restaurant calmly spraying gunfire. . . . Maria Diaz ran out the side door in panic when the shooting started, then remembered that her two-year-old son was still inside. She crept back to a window and saw him sitting obediently in a booth. She motioned him toward the door, nudged it open, and the boy toddled to safety.' [Citation.] Not everyone was so fortunate. After SWAT sharpshooters finally killed Huberty, 'police and hospital workers moved in on the gruesome scene. A mother and father lay sprawled across their baby, apparently in an attempt to shield it. All three were dead.' [Citation.] The carnage was clearly far worse than it would have been had Huberty not been armed with semiautomatic weapons. He fired hundreds of rounds. 'The gunfire was so heavy that police at first assumed that more than one gunman was inside. A fire truck took six shots before reversing direction and backing off. One fire fighter was grazed by a bullet that tore through the truck and then landed softly on his head.' [Citation.]" (*Kasler, supra,* 23 Cal.4th at p. 483.)

That the unusually dangerous nature of assault weapons was the motivation behind the assault weapons control act was underscored by Attorney General John Van de Kamp, who testified before the Committee of the Whole: "Increasingly, 'the weapons of choice for this madness,' he noted, were

'semi-automatic military assault rifles.' In Los Angeles, he said, it had 'become fashionable among hard-core members of the Crips Gang to spray a stream of bullets in hopes of taking down one rival gang member, but infants and grandmothers may be killed as well. They say that the young killers even have a phrase for it. They say, "I spray the babies to [the] eighties." ' [Citation.]" (*Kasler, supra*, 23 Cal.4th at p. 484, quoting 1 Assem. J. (1989–1990 Reg. Sess.) p. 438.) A vivid illustration of the Attorney General's observation was provided by Lieutenant Bruce Hagerty of the Los Angeles Police Department: " 'Probably the most graphic example, for me, was on Good Friday of last year, where a rival gang entered a neighborhood in South Central Los Angeles and sprayed a crowd of forty to fifty people with an AR-15, and that's an American assault rifle, shooting 14 people, killing a 19 year old boy, hitting a five year old little girl, and a 65 year old man, and all ages in between. I was the field commander of that situation, and I'm here to tell you that that was, in every sense of the word, a war scene. . . . There were bodies everywhere and people were terrified, and the only reason that this gang did that was to terrorize the neighborhood because they wanted to take it over and be able to sell drugs in that neighborhood, and the military assault rifle is the vehicle that they used. [¶] . . . I'm here to tell you that there's only one reason that they use these weapons, and that is to kill people. They are weapons of war.' [Citation.]" (*Kasler, supra*, 23 Cal.4th at p. 485, quoting 1 Assem. J. (1989–1990 Reg. Sess.) p. 450.)

The *Kasler* court concluded its review of the legislative history by noting that when Governor Deukmejian signed the assault weapons control act into law on May 24, 1989, the Governor explained: " ' "It's well known that some drug dealers and violent gang members are using assault-type weapons . . . ." . . . "In the face of such firepower, our state's courageous law enforcement officers need all the help that we can give them as they seek to preserve our public safety . . . ." ' " (*Kasler, supra*, 23 Cal.4th at pp. 486–487.) Accordingly, in enacting the assault weapons control act, the Legislature sought to address "the grave threat to public safety posed by the possession and use of assault weapons by criminals . . . ." (23 Cal.4th at p. 487.)

A review of the legislative history of the .50 Caliber BMG Regulation Act of 2004 reveals that the Legislature was not only concerned by the threat to public safety posed by the prospect of .50-caliber BMG rifles being used by criminals, but also by the threat to national security posed by the prospect of these weapons falling into the hands of terrorist organizations.

As expressed by the author of the bill: "[Fifty-caliber BMG] sniper rifles and .50 [caliber] BMG ammunition are armaments designed for military applications involving the destruction of infrastructure and anti-personnel purposes. The military uses these weapons to destroy concrete structures, including

bunkers, light armored vehicles, and stationary tactical targets such as fuel storage facilities, aircraft, communications structures and energy transfer stations. [¶] . . . [¶] [Fifty-caliber BMG] weapons and their ammunition have increasingly been manufactured and marketed to civilians over the past several years. There is increasing evidence of these weapons falling into the hands of political extremists and terrorists, and more recently drug and street gangs. The manufacturers of these weapons have been reducing the weight, enhancing portability and lowering the price to own these weapons, so there is currently an expanding proliferation of these war weapons. [¶] The facts indicate that [.50 caliber BMG] sniper weapons and .50 [caliber] BMG ammunition present a clear and present public health and safety danger to California and the nation." (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 50 (2003–2004 Reg. Sess.) as amended June 2, 2003, pp. 13–14; see also Assem. Com. on Public Safety, Analysis of Assem. Bill No. 50 (2003–2004 Reg. Sess.) Apr. 29, 2003, p. 7 ["According to the author, '[t]he fifty-caliber sniper rifle is one of the United States military's highest-powered rifles, capable of ripping through armored limousines. It is said to be able to punch holes through military personnel carriers at a distance of 2,000 yards, the length of 20 football fields. It is deadly accurate at up to one mile and effective at more than four miles. . . .' "].)

The Assembly Committee on Public Safety analysis of the bill contains the following: "The term '.50 BMG' stands for Browning machine gun (one of the earliest firearms to use the ammunition) and is a technical designation for the round used in the weapon. . . . Manufacturers of the rifles claim that the rifle is accurate up to 2,000 yards and effective up to 7,500 yards. . . . The .50 caliber ammunition . . . [is] capable of piercing through body armor. [¶] . . . [¶] . . . [¶] The Violence Policy Center has issued two reports on the .50 caliber sniper rifle. [Citations.] Both reports stated that the unregulated sale of military sniper rifles to civilians creates a danger to national security as the rifles have the ability to shoot down aircraft. [¶] The second report also states that at least 25 Barrett .50 caliber sniper rifles were sold to the Al Qaeda network. [Citations.]" (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 50 (2003–2004 Reg. Sess.) Apr. 29, 2003, pp. 7–9.)

The bill was supported by the Los Angeles County Sheriff's Department, which argued in support of the legislation: " 'This weapon, which is readily available on the civilian market, can pierce armored vehicles and concrete structures from one mile away with pinpoint accuracy. In the hands of terrorists, .50 BMG sniper rifles pose a grave threat to airplanes, refineries or other potential targets.' " (Assem. Com. on Public Safety, Analysis of Assem. Bill No. 50 (2003–2004 Reg. Sess.) Apr. 29, 2003, p. 10.)

In sum, the Legislature enacted the Roberti-Roos Assault Weapons Control Act of 1989 and the .50 Caliber BMG Regulation Act of 2004 in order to

address the proliferation and use of unusually dangerous weapons: assault weapons, with an incredibly "high rate of fire and capacity for firepower," which can be used to indiscriminately "kill and injure human beings" (§ 12275.5, subd. (a)); and .50 caliber BMG rifles, which "have such a high capacity for long distance and highly destructive firepower that they pose an unacceptable risk to the death and serious injury of human beings, destruction or serious damage of vital public and private buildings, civilian, police and military vehicles, power generation and transmission facilities, petrochemical production and storage facilities, and transportation infrastructure" (§ 12275.5, subd. (b)).

It is against this backdrop that we must analyze *Heller, supra,* 554 U.S. ___ [171 L.Ed.2d 637], and determine whether section 12280, subdivisions (b) and (c), violate the right to bear arms guaranteed by the Second Amendment to the United States Constitution.

## B

■ In *Heller, supra,* 554 U.S. ___ [171 L.Ed.2d 637], the United States Supreme Court held that "the [District of Columbia's] ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." (*Id.* at p. ___ [171 L.Ed.2d at p. 683].) In so holding, the court explained that the Second Amendment codified a preexisting right of the individual "to possess and carry weapons in case of confrontation." (*Id.* at p. ___ [171 L.Ed. at p. 657] ["The very text of the Second Amendment implicitly recognizes the pre-existence of the right and declares only that it 'shall not be infringed.' "].) However, the court was careful to point out that, like the First Amendment's right to freedom of speech, the Second Amendment's right to bear arms is not unlimited: "Thus, we do not read the Second Amendment to protect the right of citizens to carry arms for *any sort* of confrontation, just as we do not read the First Amendment to protect the right of citizens to speak for *any purpose*." (*Id.* at p. ___ [171 L.Ed.2d p. 659].)

Nor does the Second Amendment's protection extend to any type of weapon. As the *Heller* court explained, its previous decision in *United States v. Miller* (1939) 307 U.S. 174 [83 L.Ed. 1206, 59 S.Ct. 816] (*Miller*) held that the Second Amendment did not protect an individual's right to transport an unregistered short-barreled shotgun in interstate commerce. (*Heller, supra,* 554 U.S. ___ [71 L.Ed.2d at p. 675].) The reason, the court explained, was that "the *type of weapon at issue* was not eligible for Second Amendment protection: 'In the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some

reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument.' " (*Ibid.*, quoting *Miller, supra*, 307 U.S. at p. 178 [83 L.Ed. at p. 1209], italics omitted.)

The *Heller* court then elaborated on the types of weapons protected by the Second Amendment: "Read in isolation, *Miller*'s phrase 'part of ordinary military equipment' could mean that only those weapons useful in warfare are protected. That would be a startling reading of the opinion, since it would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939. We think that *Miller*'s 'ordinary military equipment' language must be read in tandem with what comes after: '[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.' [Citation.] The traditional militia was formed from a pool of men bringing arms 'in common use at the time' for lawful purposes like self-defense. 'In the colonial and revolutionary war era, [small-arms] weapons used by militiamen and weapons used in defense of person and home were one and the same.' [Citation.] Indeed, that is precisely the way in which the Second Amendment's operative clause ['the right of the people to keep and bear Arms, shall not be infringed'] furthers the purpose announced in its preface ['[a] well regulated militia, being necessary to the security of a free State']. We therefore read *Miller* to say only that the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns." (*Heller, supra*, 554 U.S. at p. \_\_\_ [171 L.Ed.2d at p. 677].)

The *Heller* court continued: "It may be objected that if weapons that are most useful in military service—M-16 rifles and the like—may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." (*Heller, supra*, 554 U.S. at p. \_\_\_ [171 L.Ed.2d at p. 679].)

Accordingly, "the right secured by the Second Amendment is not . . . a right to keep and carry any weapon whatsoever in any manner whatsoever

and for whatever purpose." (*Heller, supra,* 554 U.S. at p. ___ [171 L.Ed.2d at p. 678].) Rather, it is the right to possess and carry weapons typically possessed by law-abiding citizens for lawful purposes such as self-defense. (*Id.* at p. ___ [171 L.Ed.2d at p. 679].) It protects the right to possess a handgun in one's home because handguns are a "class of 'arms' that is overwhelmingly chosen by American society" for the lawful purpose of self-defense. (*Ibid.*)

As the court's discussion makes clear, the Second Amendment right does not protect possession of a military M-16 rifle. (*Heller, supra,* 554 U.S. ___ [171 L.Ed.2d at p. 579].) Likewise, it does not protect the right to possess assault weapons or .50-caliber BMG rifles. As we have already indicated, in enacting the Roberti-Roos Assault Weapons Control Act of 1989 and the .50 Caliber BMG Regulation Act of 2004, the Legislature was specifically concerned with the unusual and dangerous nature of these weapons. An assault weapon "has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings." (§ 12275.5, subd. (a).) The .50-caliber BMG rifle has the capacity to destroy or seriously damage "vital public and private buildings, civilian, police and military vehicles, power generation and transmission facilities, petrochemical production and storage facilities, and transportation infrastructure." (§ 12275.5, subd. (b).) These are not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense; rather, these are weapons of war.

Our conclusion that *Heller* does not extend Second Amendment protection to assault weapons and .50-caliber BMG rifles is supported by post-*Heller* federal precedent. In *United States. v. Fincher, supra,* 538 F.3d 868 (*Fincher*), the Eighth Circuit Court of Appeals held that Fincher's possession of a machine gun was "not protected by the Second Amendment" because "[m]achine guns are not in common use by law-abiding citizens for lawful purposes and therefore fall within the category of dangerous and unusual weapons that the government can prohibit for individual use." (*Fincher, supra,* 538 F.3d at p. 874; see *United States v. Gilbert* (9th Cir. 2008) 286 Fed.Appx. 383, 386 ["Under *Heller*, individuals still do not have the right to possess machineguns or short-barreled rifles."]; *Hamblen v. U.S.* (M.D.Tenn., Dec. 5, 2008, No. 3:08-1034) 2008 WL 5136586 [also holding that *Heller* did not extend Second Amendment protection to machine guns].) While the fully automatic nature of a machine gun renders such a weapon arguably more dangerous and unusual than a semiautomatic assault weapon, that observation does not negate the fact that assault weapons, like machine guns, are not in common use by law-abiding citizens for lawful purposes and likewise fall within the category of dangerous and unusual weapons that the government can prohibit for individual use. Moreover, the .50-caliber BMG rifle has the

capacity to take down an aircraft, a fact which arguably makes such a weapon more dangerous and unusual than the average machine gun. In any event, assault weapons and .50-caliber BMG rifles are at least as dangerous and unusual as the short-barreled shotgun at issue in *United States v. Miller, supra*, 83 L.Ed. 1206.

We conclude that section 12280, subdivisions (b) and (c), does not prohibit conduct protected by the Second Amendment to the United States Constitution as defined in *Heller, supra*, 554 U.S. ___ [171 L.Ed.2d 637].

## DISPOSITION

The judgment is affirmed.

Scotland, P. J., and Butz, J., concurred.

A petition for a rehearing was denied June 22, 2009, and appellant's petition for review by the Supreme Court was denied September 17, 2009, S174394.