Filed 12/12/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ARTIS CHAVEZ CRENSHAW, JR.,<br><br>        Defendant and Appellant. | A170211<br><br>(Contra Costa County<br>Super. Ct. No. 042301211) |

Artis Crenshaw, Jr. (Crenshaw), argues, among other issues raised in this appeal, that Penal Code section 30605,[1] possession of an assault weapon, violates the Second Amendment of the United States Constitution. As recently affirmed in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen* (2022) 597 U.S. 1, 8–10 [213 L.Ed.2d 387] (*Bruen*), historical tradition supports the prohibition of carrying dangerous and unusual weapons. As such, the Second Amendment only applies to weapons that are in common use at the time. We hold that section 30605 does not violate the Second Amendment. California's statutory ban on assault weapons is beyond the scope of the Second Amendment because it has not been shown that such weapons are in common use by law-abiding citizens.

Crenshaw was convicted by a jury of four felonies: driving or taking a vehicle without consent (Veh. Code, § 10851, subd. (a)); fleeing an officer while driving recklessly (Veh. Code, § 2800.2); possession of a firearm by a

---

[1] Undesignated statutory references are to the Penal Code.

felon (Pen. Code, § 29800, subd. (a)(1)); and possession of an assault weapon (Pen. Code, § 30605, subd. (a)). The trial court found true various aggravating factors and sentenced him to a total term of three years four months.

Crenshaw raises three claims: (1) his conviction for possession of an assault weapon must be vacated because it violates the Second Amendment of the United States Constitution; (2) the trial court erred by sentencing Crenshaw for both driving without the consent of the owner and fleeing a pursuing police officer when one of the convictions should have been stayed under section 654; and (3) the abstract of judgment must be corrected to reflect the actual days in custody and corresponding conduct credits. We agree that the abstract of judgment must be corrected but otherwise affirm the judgment.

## BACKGROUND

On July 2, 2023, an automatic license plate reader notified Contra Costa deputy sheriffs of a stolen car traveling on the road approximately 1:45 a.m. Deputy Sheriff Christopher Hamblin located the stolen car and positioned his patrol car behind the car to confirm the license plate matched the automatic license plate reader. He attempted to initiate a traffic stop by turning on the lights on his patrol car. The stolen car did not stop. It accelerated and entered the freeway entrance. Deputy Sheriff Hamblin initiated pursuit and turned on his sirens. The stolen car was speeding, traveling up to 115 miles per hour, weaving in and out of lanes without using turn signals, and making unsafe lane changes. California Highway Patrol officers also engaged in the pursuit. California Highway Patrol officers placed spikes to stop the stolen car, which successfully popped one of the tires. The stolen car continued driving on the flat tire, exited the freeway,

2

and ran through two red lights.  The stolen car went back onto the freeway, and soon after the popped tire completely detached from the rim of the wheel.  The car, however, continued to drive on the bare rim, causing sparks.  The stolen car again exited the freeway and was involved in a collision on the off-ramp.

California Highway Patrol officers conducted a felony car stop and discovered Crenshaw, who was driving the stolen car, along with a female passenger.  After both individuals were arrested, Deputy Sheriff Hamblin examined the car and found an "AR-style gun" on the front passenger floorboard.  The gun had a fire suppressor at the end of the muzzle; the magazine was fully seated in the magazine well; a round was loaded in the chamber; and the safety was off.  The barrel of the gun was less than 30 inches.

Crenshaw was charged by amended information with driving or taking a vehicle without consent (Veh. Code, § 10851, subd. (a); count 1); receiving a stolen motor vehicle (Pen. Code, § 496D, subd. (a); count 2); fleeing a pursuing police officer while driving recklessly (Veh. Code, § 2800.2; count 3); possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1); count 4); and possession of an assault weapon (Pen. Code, § 30605, subd. (a); count 5). The information also alleged six aggravating factors: (1) Crenshaw was armed during the commission of the crimes (Cal. Rules of Court, rule 4.421(a)(2));[2] (2) the crimes involved a taking of great monetary value (rule 4.421(a)(9)); (3) Crenshaw had served a prior prison term (rule 4.421(b)(2)); (4) he was on probation or parole at the time the crimes were committed (rule 4.421(b)(3)); (5) his prior convictions were numerous or

---

[2] Further rule citations are to the California Rules of Court.

of increasing seriousness (rule 4.421(b)(4)); and (6) his prior performance on probation or parole was unsatisfactory (rule 4.421(b)(5)).

The jury found Crenshaw guilty on all counts except count 2, receiving a stolen vehicle. Crenshaw waived his right to a jury trial on the aggravating factors. The trial court held a hearing on the aggravating factors and found true beyond a reasonable doubt that Crenshaw served prior prison terms, his prior convictions were numerous and of increasing seriousness, he was on probation at the time of the offense, and his prior performance on probation was unsatisfactory. The court sentenced Crenshaw to a total of three years four months, consisting of two years for fleeing from an officer while driving recklessly plus eight months for taking a vehicle without consent and eight months for possession of a firearm by a felon. The court imposed a concurrent sentence of two years for possession of an assault weapon but stayed the punishment per section 654.

## DISCUSSION

### I. *Section 30605, possession of an assault weapon, does not violate the Second Amendment of the United States Constitution.*[3]

" 'A defendant challenging the constitutionality of a statute carries a heavy burden: "The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity." ' " (*People v. Bocanegra* (2023) 90 Cal.App.5th 1236, 1250 (*Bocanegra*), quoting *People v. Fuiava* (2012) 53 Cal.4th 622, 696.) Contrary to Crenshaw's assertion, California courts have consistently held that in a facial challenge the defendant bears the burden of showing a statute is unconstitutional. (E.g., *In re D.L.* (2023)

---

[3] We need not address the forfeiture issue because we resolve this matter on the merits.

4

93 Cal.App.5th 144, 156–157 ["We join the California courts that have applied this standard when evaluating facial challenges to gun regulations based on *Bruen*"].)

"A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." (U.S. Const., 2d Amend.) "[T]he Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment," such that "the Second Amendment right is fully applicable to the States." (*McDonald v. Chicago* (2010) 561 U.S. 742, 791, 750 [177 L.Ed.2d 894] (*McDonald*).)

Recently, in *Bruen*, the United States Supreme Court clarified the appropriate analysis in deciding Second Amendment claims, reaffirming its previous holdings in *District of Columbia v. Heller* (2008) 554 U.S. 570 [171 L.Ed.2d 637] (*Heller I*) and *McDonald, supra*, 561 U.S. 742. There, the court rejected the "two-step test that Courts of Appeal" developed after *Heller I* and *McDonald* as "one step too many." (*Bruen, supra*, 597 U.S. at pp. 17–19.) In doing so, the court found the first step of this "predominant framework," in which the "Courts of Appeals [would] ascertain the original scope of the right based on its historical meaning," was "broadly consistent with [*Heller I*], which demands a test rooted in the Second Amendment's text, as informed by history." (*Bruen*, at pp. 18–19.) The *Bruen* court held that "[*Heller I*] and *McDonald* do not support applying means-end scrutiny in the Second Amendment context" as prescribed by the second step of the two-step approach. (*Bruen*, at p. 19.) "Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." (*Ibid.*)

To show why *Heller I* does not support applying means-end scrutiny, the *Bruen* court summarized *Heller I*'s methodological approach, beginning

5

with a " 'textual analysis' focused on the ' "normal and ordinary" ' meaning of the Second Amendment's language." (*Bruen, supra*, 597 U.S. at p. 19–20.) "After holding that the Second Amendment protected an individual right to armed self-defense, we also relied on the historical understanding of the Amendment to demark the limits on the exercise of that right. We noted that, '[l]ike most rights, the right secured by the Second Amendment is not unlimited.' [Citation.] 'From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' [Citation.] For example, we found it 'fairly supported by the historical tradition of prohibiting the carrying of "dangerous and unusual weapons" ' that the Second Amendment protects the possession and use of weapons that are ' "in common use at the time." ' " (*Bruen*, at p. 21.)

The *Bruen* court then reiterated the appropriate standard for assessing Second Amendment claims: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Bruen, supra*, 597 U.S. at p. 24.) This test, originally set forth in *Heller I*, "requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." (*Bruen*, at p. 26.)

Here, Crenshaw challenges his conviction under section 30605, claiming the law violates the Second Amendment as recently interpreted under *Bruen*. Particularly, Crenshaw claims that assault weapons are protected under the Second Amendment because they are in common use

6

within the United States, bringing them within the scope of the Second Amendment. We disagree.

Section 30605, provides, in pertinent part: "Any person who, within this state, possesses any assault weapon, except as provided in this chapter, shall be punished by imprisonment in a county jail for a period not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170." (§ 30605, subd. (a).) Section 30510 defines " 'assault weapon' " with a list of specified semiautomatic firearms identified by make, model, and/or series. Section 30515, subdivision (a) provides several additional definitions of " 'assault weapon.' " Included in these definitions, and as relevant here, the definition of " 'assault weapon' " includes a "semiautomatic, centerfire rifle that has an overall length of less than 30 inches." (§ 30515, subd. (a)(3).)

In *Bocanegra*, the Third District Court of Appeal addressed whether section 30605 violates the Second Amendment and held it did not because assault weapons are "not presently possessed by law-abiding citizens in California for lawful purposes." The *Bocanegra* court found the ban on assault weapons has been consistently upheld for over 30 years in California, even after the United States Supreme Court's *Heller I* decision, in *People v. James* (2009) 174 Cal.App.4th 662 and *People v. Zondorak* (2013) 220 Cal.App.4th 829. (*Bocanegra, supra*, 90 Cal.App.5th at p. 1252.) *Bocanegra* noted that this line of cases upheld the ban by finding assault weapons do not fall within the scope of the Second Amendment under the first step of the two-step framework. (*Bocanegra*, at pp. 1248–1250.) Recognizing that *Bruen* reaffirmed the first step of this analysis, finding it largely consistent with *Heller I*, *Bocanegra* concluded that the line of cases upholding California's assault weapons ban were still good law and held that

7

section 30605 does not violate the Second Amendment. (*Bocanegra*, at pp. 1254–1257.)

Crenshaw alleges that *Bocanegra* "does not properly adhere to *Bruen* and overlooks the fact that the Second Amendment is a constitutional right that applies to all citizens, regardless of the state where they reside." Crenshaw contends California cannot "lawfully prohibit possession of a firearm that is considered to be 'in common use' throughout the United States as a whole." He supports his claim that assault weapons are in common use by relying on language from *Bocanegra*, multiple federal authorities, and various law review articles. None of these sources supports Crenshaw's claim.

First, Crenshaw states *Bocanegra* acknowledged that assault weapons " 'are in common use in other jurisdictions.' " This is a misleading quotation. The full quotation states, "We acknowledge, of course, that these weapons *may be* in common use in other jurisdictions. However, the scope of our concern is limited to California and the constitutionality of section 30605." (*Bocanegra, supra*, 90 Cal.App.5th at p. 1253, italics added.) Thus, while *Bocanegra* did acknowledge the potential of assault weapons being common in other jurisdictions, it made no factual finding to that effect.

Next, Crenshaw relies on *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo* (2d Cir. 2015) 804 F.3d 242, 255–256 (*Cuomo*) and *Heller v. District of Columbia* (D.C. Cir. 2011) 670 F.3d 1244, 1260–1261 (*Heller II*). However, both cases assumed, without deciding, that an assault weapon ban impinged on the Second Amendment right to bear arms. Particularly, both courts found that based on the record before them, it was unclear whether assault weapons were typically possessed by law-abiding citizens for lawful purposes. (*Cuomo*, 804 F.3d at pp. 256–257; *Heller II*, 670 F.3d at p. 1261.)

8

Thus, *Cuomo* and *Heller II* do not stand for the position that assault weapons unquestionably fall within the purview of the Second Amendment and, therefore, do not support Crenshaw's contentions.

Then, Crenshaw relies on *Miller v. Bonta* (2023) 699 F.Supp.3d 956, which found that assault rifles are commonly owned for lawful purposes (*id.* at p. 975) and that section 30605 violated the Second Amendment.[4] (*Id.* at pp. 1010–1011.)  Yet, *Miller v. Bonta*'s factual findings and legal conclusions are not binding on our court.  (*People v. Bradley* (1969) 1 Cal.3d 80, 86 ["we are not bound by the decisions of the lower federal courts even on federal questions"].)  Moreover, *Miller v. Bonta*'s findings and conclusions conflict with the Third District Court of Appeal's findings in *Bocanegra.*

Crenshaw also analogizes assault weapons to stun guns, relying on Justice Alito's concurrence in *Caetano v. Massachusetts* (2016) 577 U.S. 411 [194 L.Ed.2d 99].  Crenshaw claims that stun guns' being banned in only a few states was highly relevant to the Supreme Court's conclusion that a categorical ban of stun guns violated the Second Amendment.  However, *Caetano* was a per curiam opinion in which the Supreme Court, in two pages, vacated and remanded the Supreme Judicial Court of Massachusetts's judgment upholding a categorical ban on stun guns because the reasons it provided for doing so were inconsistent with *Heller I.*  (*Caetano*, at pp. 411– 412.)  While Justice Alito's concurrence, which only Justice Thomas joined, did find the ban violated the Second Amendment (*Caetano*, at p. 420 (conc. opn. of Alito, J.)), that opinion is not binding precedent.

---

[4] The district court in *Miller v. Bonta, supra*, 699 F.Supp.3d 956, issued an order enjoining enforcement of section 30605.  An appeal was filed in that case, the Ninth Circuit stayed the order, and the appeal is currently in abeyance.

Lastly, Crenshaw cites various law review articles for support. In his opening brief, Crenshaw quotes Chapman, *Are Semiautomatic Rifles "Dangerous and Unusual" Weapons?* (2023) 54 U.Tol.L.Rev. 191, 210, and asserts: " '[S]emiautomatic rifles like the AR-15 are widely owned and used by private citizens for lawful purposes *in the millions*. As such, they are in no way among the "dangerous and unusual" weapons historically outside the ambit of the traditional right to keep and bear arms and are well within the scope of the Second Amendment's protection.' " Similarly, in his reply brief, Crenshaw cites additional law review articles and a district court case to provide some history on the use of assault weapons and additional facts supporting his claim that such weapons are "common for civilian use in the United States." Crenshaw offers the following facts: AR-15 rifles have become the " 'most popular rifle in American history' "; over 3 million "AR-type and AK-type rifles were imported into the United States" between 1990 and 2012; in 2012, "20.3 percent of all new firearms sold were AR-type rifles"; "AR-type rifles accounted for 11.4 percent of firearms manufactured for sale in the United States" between 2008 and 2012; and, "[s]tatistically, these commonly owned firearms are least likely to be used for unlawful purposes, particularly compared to . . . handguns . . . ."

However, Crenshaw has not presented any cognizable evidence or empirical support for his claim that the assault weapons banned by section 30605 are in common use. Crenshaw's reliance on general assertions about AR-type rifles from law review articles and federal authorities emphasizes the lack of relevant facts in the record. Crenshaw's claim requires the development of a more robust factual record, particularly on the prevalence of the gun at issue here. As an appellate court, absent exceptional circumstances, we consider only evidence in the record.

(*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3 ["normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered' "].) This is not an inquiry that turns on the review of abstract and generalized legal concepts; thus, we are not well suited to address this constitutional challenge on appeal for the first time. (*In re Sheena K.* (2007) 40 Cal.4th 875, 885.)

The federal authorities Crenshaw cites are not binding on this court (*People v. Bradley, supra*, 1 Cal.3d at p. 86), and we decline to treat Crenshaw's factual assertions as sufficient evidence that the assault weapons covered in section 30605 are in common use. (See *County of Orange v. Smith* (2005) 132 Cal.App.4th 1434, 1450 [declining to take judicial notice of two law review articles].) On this record, we see no reason to reexamine this state's unanimous precedent that section 30605 does not violate the Second Amendment.

## II. *Fleeing a pursuing officer and driving a vehicle without consent are subject to separate punishments under section 654.*

Crenshaw argues that the trial court erred in failing to stay one of the sentences for either fleeing a pursuing officer or driving a vehicle without consent under section 654 because both crimes were completed by a single physical act. Specifically, Crenshaw claims that the only evidence presented at the trial supporting both convictions was his driving the stolen vehicle. We disagree.

"An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a).)

11

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives. [Citations.] At step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical act. [Citation.] When those facts are undisputed . . . the application of section 654 raises a question of law we review de novo." (*People v. Corpening* (2016) 2 Cal.5th 307, 311–312 (*Corpening*).) "We review any factual findings underlying the trial court's ruling for substantial evidence." (*People v. Washington* (2021) 61 Cal.App.5th 776, 795.)

"Whether a defendant will be found to have committed a single physical act for purposes of section 654 depends on whether some action the defendant is charged with having taken separately completes the actus reus for each of the relevant criminal offenses." (*Corpening, supra*, 2 Cal.5th at p. 313.)

In considering whether the sentences for these crimes should be stayed pursuant to section 654, the trial court stated: "The crimes are separate acts. He was—whether or not he was seen by the police and pursued by the police, he was driving the car . . . . [¶] And he didn't have to run from the police. In a real way, these crimes are independent of each other." The court also acknowledged "that the crimes occurred essentially at the same period of time" but still found the crimes to be separate acts.

It is undisputed that Crenshaw was driving the stolen car when Deputy Hamblin attempted to stop him. It was the act of driving the car that is essential to both crimes. However, driving a car is not a single physical act but a course of conduct encompassing several acts. Thus, the relevant question is whether that course of conduct reflects a singular intent and objective. (*Corpening, supra*, 2 Cal.5th at p. 312.) We find it does not.

The evidence shows that Deputy Hamblin was alerted to the stolen car's being driven on the street by the automatic license plate reader. He then located the car and pulled up behind it to confirm the license plate matched the notification from the license plate reader, and only then did he attempt to initiate a traffic stop. Therefore, during the period before Deputy Hamblin initiated the traffic stop, Crenshaw was only driving without permission from the owner. Once the traffic stop was initiated, Crenshaw made a separate decision to evade the police and developed a new intent and objective which was not present before that moment. Thus, the evidence supports finding that the crimes are not subject to section 654 and the trial court correctly sentenced Crenshaw.

## III. *The abstract of judgment must be amended.*

Lastly, Crenshaw argues the trial court erred in calculating his actual days of presentence custody credit and his conduct credit. The court awarded him 261 actual days of presentence custody credit plus 260 days of conduct credit for a total of 521 days of credit. However, according to Crenshaw, the record shows he is entitled to 262 actual days of custody credit plus 262 days of conduct credit, for a total of 524 days. The People agree with Crenshaw, as do we.

"[A] sentencing court must award credits for all days in custody up to and including the day of sentencing." (*People v. Bravo* (1990) 219 Cal.App.3d

13

729, 735, citing *People v. Smith* (1989) 211 Cal.App.3d 523, 527.)  This includes partial days.  (*People v. King* (1992) 3 Cal.App.4th 882, 886.)  In addition to actual credit, which accumulates from time spent in custody, detainees in local institutions are usually able to earn credit against their eventual sentence for good behavior and work performed.  (§ 4019.)

The probation report, filed February 27, 2024, stated that as of the day of sentencing, Crenshaw would have spent a total of 244 days in custody.  This calculation referred to the original sentencing date of March 1, 2024, but the hearing was continued to March 19, 2024.  From the date he was arrested, July 2, 2023, to the date he was sentenced, Crenshaw spent a total of 262 days in custody, including the partial day when he was sentenced.  Thus, the abstract of judgment should be corrected to reflect that Crenshaw is entitled to 262 days of actual credit and, accordingly, 262 days of conduct credit, for a total of 524 days of custody credit.

## DISPOSITION

The judgment is affirmed.  The trial court is directed to amend the abstract of judgment to include 262 actual days of custody credit plus 262 days of conduct credit, for a total of 524 days.  The court is directed to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


Jackson, P. J.


WE CONCUR:

Simons, J.
Chou, J.


A171211/*People v. Artis Chavez Crenshaw, Jr.*

14

A171211/People v. Crenshaw

Trial Court:       Superior Court of the County of Contra Costa

Trial Judge:      John Cope

Counsel:          Rachel Varnell, under appointment by the Court of
Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters and
Jeffrey M. Laurence, Assistant Attorneys General,
Eric D. Share and Maya Bourgeois, Deputy
Attorneys General, for Plaintiff and Respondent.