Filed 4/28/23

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | C095234 |
| Plaintiff and Respondent, | (Super. Ct. No. MAN-CR-FE-2020-0000637) |
| v. | |
| ALEX ANDY BOCANEGRA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Joaquin County, Patrick J. Smalling, Judge. Affirmed and remanded for resentencing.

Kaiya R. Pirolo, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Kimberley A. Donohue and Ross K. Naughton, Deputy Attorneys General, for Plaintiff and Respondent.

---

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part I of the discussion.

Defendant Alex Andy Bocanegra and Vernon R. were very close friends for decades.  However, one Christmas, defendant, who was married, slept with Vernon R.'s girlfriend.  The next year, Vernon R., by his account, slept with defendant's wife, or, by her account, forcefully tried to.  In either case, by this point, the friendship between defendant and Vernon R. was "dead."  Rather than allowing this saga to end, on the night of January 12, 2020, defendant drove from his home in San Jose to Vernon R.'s home in Manteca armed with three firearms including an AR-15 style rifle.  Defendant broke a front window and fired shots into the house as Vernon R. scrambled through the house and dove out a bedroom window to get away.

A jury found defendant not guilty of attempted murder, but found him guilty of assault with a firearm, possession of an assault weapon, discharging a firearm in a grossly negligent manner, and causing a concealed firearm to be carried in a vehicle while an occupant, and found true an allegation that, in committing assault with a firearm, defendant personally used a firearm in the commission of a felony.

On appeal, defendant asserts (1) the matter must be remanded for resentencing based on changes to Penal Code section 654[1] made by Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Assembly Bill No. 518), and (2) his conviction of possession of an assault weapon must be reversed because section 30605 is unconstitutional under the Second Amendment and the United States Supreme Court's recent decision in *New York State Rifle & Pistol Association, Inc. v. Bruen* (2022) ___U.S.___ [213 L.Ed.2d 387] (*Bruen*).

Agreeing with defendant on his first point, we shall remand for resentencing. Otherwise, we affirm defendant's convictions.  Consistent with prior California case law addressing its statutory predecessor, we conclude section 30605 does not violate the

---

[1]     Further undesignated statutory references are to the Penal Code.

Second Amendment as construed by the United States Supreme Court in *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*).

## BACKGROUND

An information charged defendant with attempted premeditated murder (§§ 664, 187, subd. (a); count 1), assault with a firearm (§ 245, subd. (a)(2); count 2), possession of an assault weapon (§ 30605, subd. (a); count 3), discharging a firearm in a grossly negligent manner (§ 246.3, subd. (a); count 4), and causing a concealed firearm to be carried in a vehicle while an occupant (§ 25400, subd. (a)(3); count 5). In connection with count 1, the information alleged defendant personally discharged a firearm. (§ 12022.53, subd. (c).) In connection with counts 1 and 2, the information alleged defendant personally used a firearm in the commission of a felony. (§ 12022.5, subd. (a).)

### *The Prosecution Case*

Vernon R. and defendant had been friends for more than 20 years, since they were teenagers. In 2018, Vernon R., his girlfriend, and their five kids went to defendant's house in San Jose to celebrate Christmas with defendant and his family. At some point while they were there, defendant slept with Vernon R.'s girlfriend.

Around Thanksgiving 2019, defendant confessed to Vernon R. and told him the affair with Vernon R.'s girlfriend was a "one-time thing." By this time, Vernon R. and his girlfriend had broken up. However, Vernon R. talked to her, and "more stuff started coming out." She told Vernon R. she had been with defendant "a few more times throughout the year."

Vernon R. contacted defendant's wife to tell her about the affair. Thereafter, defendant's wife kicked defendant out of the house, and he went to stay with family. Vernon R. and defendant's wife had many conversations about the affair over the following days.

3

On or about December 4, 2019, defendant's wife met Vernon R. at his tattoo shop because she wanted Vernon R. to give her a tattoo. However, after meeting at the tattoo shop, they instead went to Vernon R.'s house in Manteca where, according to Vernon R., they slept together. Defendant's wife then went back home to San Jose.

At some point, defendant called Vernon R. and asked Vernon R. if he had slept with his wife. Vernon R. admitted he had. At that point, the friendship "was dead."

On January 12, 2020, at approximately 1:45 a.m., Vernon R. was asleep in his room. His kids were not home, and he was alone in the house. He awoke to the sound of breaking glass. After he got up, he heard a window break in the kids' room. Looking into that room, he saw the curtains moving. He then saw a flashlight pointed at him through a hole in the window. The person who was holding the flashlight also appeared to be holding something else. Vernon R. then heard the clicking of a gun. He heard at least a couple of clicks.

Vernon R. ran to the front door. He opened the door, saw that his back gate was open, and yelled, "Get out of my backyard." A person holding a gun started walking towards him. It looked to Vernon R. like the person was cocking the gun, which Vernon R. described as a chrome revolver. Vernon R. slammed the door shut and locked it. Then he heard his front room window "get shot out."

Vernon R. ran towards his bedroom as more shots rang out. He dove through the window into the backyard. Outside, Vernon R. ran around to the street and took cover behind some cars. Vernon R. watched the gunman look through the front window into Vernon R.'s house. The person then just walked off. Vernon R. flagged down a police car. He pointed to the person walking away and told police the person had just shot at him.

Manteca Police Officer Carlos Gutierrez saw a silver Infinity and positioned his patrol car in front of it. The Infinity attempted to move away in reverse, but Gutierrez drew his firearm and stopped the car. Defendant was the driver. Gutierrez observed

4

fresh blood from small cuts on defendant's hands. Gutierrez thought the cuts looked like they resulted from broken glass.

Defendant told police he did not have any weapons on his person, but that "he had protective guns in his vehicle." Officer Gutierrez saw a silver revolver and an AR-15 style rifle on the front passenger-side floor of defendant's car. On the back-seat floor, there was a box containing a "1911-style handgun."

When Officer Heriberto Cardenas inspected the AR-15 rifle, he saw a red drop by the trigger guard or the bottom of the receiver that looked like blood. The rifle had a live round in the barrel and 12 live rounds in the magazine. Police had difficulty ejecting the round in the chamber. It appeared to be stuck or jammed. Cardenas also inspected the revolver and discovered it contained three spent shell casings and that two of the cylinders were empty. He also noticed a red drop that looked like blood on the gun's trigger guard. Lastly, Cardenas inspected the Rock Island Armory 1911 .45-caliber semiautomatic pistol that had been in a box on the floor of the back seat. There was no magazine in the gun, but Cardenas found a magazine containing seven live rounds in the car's center console.

Officer Salvador Montero inspected the AR-15 rifle. It had a flash suppressor at the end of the barrel, a pistol grip protruding from the bottom portion of the action, a magazine release button, and a telescoping buttstock. A pistol grip allows the user "to better manipulate the weapon's action, whether it be placing the weapon on fire safe, manipulating the trigger, and manipulating the magazine release button." A flash suppressor suppresses the flash from the weapon when it is fired. Depressing the magazine release button causes the magazine to fall out of the weapon, allowing for faster unloading and reloading. A telescoping buttstock increases or decreases the length of the weapon allowing for variability in its stability and compactness. Montero testified that a firearm might make a clicking sound if it malfunctions or if it is empty.

5

Upon returning to his house, Vernon R. realized his power was out.  Outside, he discovered the breaker box door was open.  Police observing the breaker switches realized the power had been shut off.  Inside the house, Vernon R. discovered bullet holes in the walls, in the closet, and in his couch.  Police found a bullet and a bullet fragment.

Later, when Vernon R. was driving to the police station, he saw defendant's Infinity in the street with all the doors open.  At that moment Vernon R. "knew it was" defendant.  Months later, Vernon R.'s son found a bullet underneath bunk beds.  Vernon R. gave the bullet to police.

Officer Montero interviewed defendant at the police station and the prosecution played a recording of the interview for the jury.  During the interview, defendant acknowledged he drove to Vernon R.'s house in Manteca and that he had his guns with him.  He said he wanted to get Vernon R. to stop calling his wife a "whore."  Defendant said he knocked on the door and tried to get Vernon R. to talk to him.  Defendant initially told Montero he "didn't shoot at all," but eventually he admitted he broke Vernon R.'s window with his gun and shot two rounds into the house.  However, defendant told Montero he shot "down" toward the ground and that he did not actually shoot at Vernon R.

*The Defense Case*

Defendant's wife testified that, in 2019, Vernon R. called her at work and told her defendant had an affair with Vernon R.'s girlfriend in 2018.  Defendant's wife confronted defendant and he admitted what had happened.  Defendant's wife kicked defendant out of the house.

Defendant's wife went to see Vernon R. on December 4, 2019.  At Vernon R.'s house, they drank until they emptied the bottle.  Defendant's wife was drunk.  Vernon R. started to kiss her but she turned away.  Vernon R. kept on making advances and defendant's wife kept trying to make him stop.  He put his hand up her shirt, rubbed her legs, tried to unbutton her pants, and revealed his penis.  Defendant's wife managed to

6

push Vernon R. away, and eventually, he stopped his advances and defendant's wife passed out. Later, she woke up and went home.

About two weeks later, defendant and his wife agreed to work things out and he came back home. Vernon R. started to post on social media that defendant's wife was a "whore and a slut and . . . was just out there trying to sleep with everyone . . . ." Defendant told his wife he intended to go talk with Vernon R. and ask him to stop posting insults on social media. Thus, she knew that, on January 12, 2020, defendant was going to talk to Vernon R. and tell him to stop posting insults on social media. She thought they were going to be able to have a cordial conversation.

*Verdicts and Sentencing*

The jury found defendant not guilty on count 1, attempted premeditated murder, and not guilty of the lesser included offense of attempted voluntary manslaughter. The jury found defendant guilty on counts 2 through 5. The jury found true the enhancement allegation that, in connection with count 2, defendant personally used a firearm in the commission of a felony. (§ 12022.5, subd. (a).)

The trial court sentenced defendant to an aggregate term of seven years and eight months. The court sentenced defendant to the midterm of three years on count 2 plus the midterm of four years for the section 12022.5 subdivision (a) enhancement, eight months, one-third of the midterm, on count 3, and one year on count 5 to run concurrently with the sentence imposed on count 2.[2]

---

[2] As to count 4, the trial court stated: "governed by . . . [section] 654, the Court does not impose any additional time." Thus, the trial court did not impose a sentence on count 4 and stay execution of that sentence pursuant to section 654. This was in error. "[W]hen a court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence but to stay the *execution* of the duplicative sentence . . . ." (*People v. Duff* (2010) 50 Cal.4th 787, 796; see *People v. Alford* (2010) 180 Cal.App.4th 1463, 1469.) We need not remedy this error, however, because we are remanding for resentencing.

DISCUSSION

I

*Assembly Bill No. 518*

At the time of defendant's sentencing, former section 654, subdivision (a) provided, in part: "[a]n act or omission that is punishable in different ways by different provisions of law *shall be punished under the provision that provides for the longest potential term of imprisonment*, but in no case shall the act or omission be punished under more than one provision." (§ 654, former subd. (a), italics added.)  As amended by Assembly Bill No. 518, which went into effect January 1, 2022, section 654 now provides, in part: "[a]n act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a), italics added.)  Thus, as amended, where section 654 applies, that section now authorizes trial courts to exercise their discretion in choosing the count for which punishment will be imposed and executed rather than requiring the longest potential term of imprisonment.

Defendant asserts we must remand for resentencing so the trial court may exercise its discretion and choose, between counts 2 and 4, which sentence to impose and execute and which to impose and stay pursuant to section 654.  Defendant asserts Assembly Bill No. 518 applies retroactively to his case.  According to defendant, because the trial court could not have been aware of its newly authorized discretion at the time of sentencing, his sentencing was not made in the exercise of the trial court's informed discretion.  Defendant further asserts remand would not be an idle act because the record does not conclusively indicate whether the trial court would have exercised its discretion to impose and execute sentence on count 2 or 4.

The Attorney General agrees Assembly Bill No. 518 applies retroactively to defendant's case.  However, the Attorney General further contends remand would be an idle act.  The Attorney General relies on the fact that, if the trial court exercised its

8

discretion in the manner contemplated by defendant and stayed the longer term, the resulting sentence would be three years. However, the trial court at sentencing rejected as insufficient a low term of five years on count 2 (consisting of the low term of two years on count 2 plus the low term of three years on the firearm enhancement). Thus, as the Attorney General articulates it: "[t]here is no reason to give the trial court a chance to impose a three-year sentence when it has stated clearly and quite firmly that a five-year sentence would be inadequate."

We agree with the parties that, under the principles of *In re Estrada* (1965) 63 Cal.2d 740, Assembly Bill No. 518 applies retroactively to defendants, like defendant here, whose convictions were not yet final when the law became effective on January 1, 2022. (*People v. White* (2022) 86 Cal.App.5th 1229, 1236; accord, *People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.) An abuse of discretion occurs where a court is unaware of the scope of its discretion. (See *People v. Carmony* (2004) 33 Cal.4th 367, 378 ["abuse of discretion occurs where the trial court was not 'aware of its discretion' to dismiss"].) Where a court imposes sentence unaware of the scope of its discretion, " 'the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*Gutierrez*, at p. 1391; accord, *People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 ["if ' "the record shows that the trial court would not have exercised its discretion even if it believed it could do so, then remand would be an idle act and is not required" ' "].) Therefore, we turn to the record of sentencing to determine whether remand would be an idle act.

In initially pronouncing the tentative sentence, which it would ultimately adopt, the trial court cited aggravating circumstances related to the crimes including that the

crimes involved great violence, risk of great bodily harm, the threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness. (Cal. Rules of Court, rule 4.421(a)(1).)[3] The trial court noted defendant fired a firearm three times into Vernon R.'s home, and possibly at Vernon R. Defendant was armed with and used a firearm during the commission of the offenses. (Rule 4.421(a)(2).) When the police stopped defendant, he had two handguns and an AR-15 style rifle. The court stated Vernon R. was particularly vulnerable in that he was unarmed and sleeping at the time. (Rule 4.421(a)(3).) The court stated the manner in which defendant committed the crimes indicated planning, sophistication, or professionalism. (Rule 4.421(a)(8).) Defendant "drove from San Jose to Manteca in the middle of the night, was loaded for bear with three firearms." Additionally, the power to Vernon R.'s house was cut, giving rise to the reasonable inference defendant did so to "gain additional advantage against [Vernon R.] as he confronted him in the darkness." Defendant also took advantage of a position of trust as a former friend and as someone familiar with Vernon R.'s home. (Rule 4.421(a)(11).)

The trial court also considered aggravating circumstances relating to defendant, including that he had engaged in violent conduct indicating he was a serious danger to society. (Rule 4.421(b)(1).) He had a prior conviction as an adult and sustained petitions as a juvenile which, although not numerous, were increasing in seriousness. (Rule 4.421(b)(2).)

In mitigation, the trial court noted Vernon R. was an initiator of, willing participant in, or an aggressor or provoker of the incident if only insofar as he contributed to a continuation of tensions. (Rule 4.423(a)(2).) For similar reasons, the court found the crime was committed because of unusual circumstances, such as great provocation, that

---

[3] Further undesignated citations to rules are to the California Rules of Court.

10

were unlikely to recur. (Rule 4.423(a)(3).) The court stated defendant acknowledged wrongdoing before arrest or at an early stage in the proceedings. (Rule 4.423(b)(8).) The court specified defendant did admit to firing his handgun into Vernon R.'s home, although he also insisted he fired into the ground which, according to the court, "is clearly not what happened." The court also noted defendant's prior performance on probation or parole had been satisfactory. (Rule 4.423(b)(15).) Additionally, the court reviewed defendant's letter of apology to Vernon R.

Defense counsel advocated for a low term sentence. The prosecutor responded that this was not a low term case, the evidence spoke for itself, and defendant shot a gun multiple times into Vernon R.'s home.

The trial court stated it agreed with the prosecution. The court stated it did not believe defendant posed any future risks. It further stated defendant was tested and he "failed in this moment miserably." The court stated defendant was "raised better" and observed he had "a community of people that care deeply about you." The court also agreed with the prosecutor that Vernon R.'s home was a duplex and "[b]ullets go through walls," suggesting someone other than Vernon R. could have been shot. The court stated: "[T]here has to be consequences for this kind of behavior. The consequences are not insignificant, they just are not. It's not a low-term case, I know that you may have been hopeful and wishing and praying on this point, I respect that, but it's not. All things being equal, it's not." The court then imposed sentence as set forth *ante*.[4]

On this record, we cannot conclude that the trial court would have reached the same sentencing conclusions had it been aware of the newly authorized discretion under section 654 as amended by Assembly Bill No. 518. It is true, as the Attorney General

---

[4] As the Attorney General notes, at sentencing, defendant did not request that the trial court dismiss the section 12022.5 firearm enhancement. (See generally §§ 12022.5, subd. (c), 1385.)

emphasizes, that the trial court did state this was not a low term case. However, the court also emphasized a number of mitigating circumstances, including, among others, that defendant acknowledged wrongdoing. Additionally, the court indicated it had considered 28 letters written in support of defendant. Nor did the court impose the maximum sentence or indicate defendant should be incarcerated for the lengthiest possible term. The court rejected the prosecution's request that it sentence defendant to a maximum term of 15 years and eight months. Moreover, we note California's sentencing laws have continued to evolve, making it ever more difficult for reviewing courts to determine with requisite certainty that the record clearly indicates what the sentencing court would have done had it been aware of the scope of its discretion. We also note that, at resentencing, the sentencing court would be entitled to consider evidence of defendant's "good and bad postsentencing conduct in prison." (*People v. Yanaga* (2020) 58 Cal.App.5th 619, 627-628 [at resentencing to consider whether to strike a firearm enhancement, the sentencing court may consider the defendant's postsentencing conduct while incarcerated].)

We cannot conclude the "record in this case demonstrates with unusual clarity that remand would be an idle act." (*People v. Flores* (2020) 9 Cal.5th 371, 432.) Because we cannot conclude the trial court would have made the same sentencing choices had it been aware of its newly authorized discretion under section 654 as amended by Assembly Bill No. 518, we shall remand for full resentencing. (*People v. Valenzuela* (2019) 7 Cal.5th 415, 424-425 ["full resentencing rule allows a court to revisit all prior sentencing decisions when resentencing a defendant"], citing *People v. Buycks* (2018) 5 Cal.5th 857, 893 & *People v. Navarro* (2007) 40 Cal.4th 668, 681.)

II

*Section 30605*

A.      *The Parties Contentions*

Defendant asserts his conviction on count 3 for possession of an assault weapon must be reversed because section 30605 violates his Second Amendment right to bear

12

arms.  According to defendant, section 30605 "does not pass the simplified historical test" dictated by the United States Supreme Court in *Bruen, supra*, ___U.S. ___ [213 L.Ed.2d 387].

The Attorney General disagrees.  Among other things, the Attorney General asserts that two pre-*Bruen* California cases that upheld the statutory predecessor to section 30605 remain good law.

We agree with the Attorney General and conclude section 30605 does not violate the Second Amendment as construed by *Heller, supra*, 554 U.S. 570.

B.      *The Second Amendment and Section 30605*

The Second Amendment states:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  The "Second Amendment right is fully applicable to the States." (*McDonald v. City of Chicago, Ill.* (2010) 561 U.S. 742, 750 (*McDonald*); see *id*. at p. 791 ["the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*"].)

The statute defendant challenges here, section 30605, provides, in pertinent part: "Any person who, within this state, possesses any assault weapon, except as provided in this chapter, shall be punished by imprisonment in a county jail for a period not exceeding one year, or by imprisonment pursuant to subdivision (h) of Section 1170." (§ 30605, subd. (a).)

Section 30515, subdivision (a) contains a number of definitions of "assault weapon."  These definitions describe weapons with particular features that enhance the lethality of the weapons. Representative of these definitions, and relevant here, the definition of "assault weapon" includes:  "A semiautomatic, centerfire rifle that does not have a fixed magazine but has any one of the following:  [¶]  (A) A pistol grip that protrudes conspicuously beneath the action of the weapon.  [¶]  (B) A thumbhole stock. [¶]  (C) A folding or telescoping stock.  [¶]  (D) A grenade launcher or flare launcher.  [¶]

13

(E) A flash suppressor.  [¶]  (F) A forward pistol grip." (§ 30515, subd. (a)(1).)

Additionally, section 30510 further defines "assault weapon" with a list of specified semiautomatic firearms identified by make, model, and/or series.

In enacting the Roberti-Roos Assault Weapons Control Act of 1989 (Stats. 1989, ch. 19, § 3) (AWCA), including the prohibition on possession of assault weapons now found at section 30605, the Legislature stated, originally at former section 12275.5 and now in section 30505:  "The Legislature hereby finds and declares that the proliferation and use of assault weapons poses a threat to the health, safety, and security of all citizens of this state.  The Legislature has restricted the assault weapons specified in Section 30510 based upon finding that each firearm has such a high rate of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings.  It is the intent of the Legislature in enacting this chapter to place restrictions on the use of assault weapons and to establish a registration and permit procedure for their lawful sale and possession.  It is not, however, the intent of the Legislature by this chapter to place restrictions on the use of those weapons which are primarily designed and intended for hunting, target practice, or other legitimate sports or recreational activities." (§ 30505, subd. (a); see *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 482-488 (*Kasler*) [discussing extensively the Legislature's intent in enacting the AWCA].)

C.      *District of Columbia v. Heller*

In *Heller*, the United States Supreme Court held that the District of Columbia's "ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." (*Heller, supra*, 554 U.S. at p. 635.)  According to the Supreme Court, "the inherent right of self-defense has been central to the Second Amendment right." (*Id*. at p. 628.)  The "core lawful purpose" of the Second Amendment is self-defense. (*Id*. at p. 630.)  As restated in *Bruen*, "[i]n *Heller* and *McDonald*, we held that

14

the Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." (*Bruen, supra*, ___U.S. at p.___ [213 L.Ed.2d at p. 405].)  And, as restated elsewhere in *Bruen*, "[a]s we stated in *Heller* and repeated in *McDonald*, 'individual self-defense is "the *central component*" of the Second Amendment right.' " (*Id.* at p.___ [ 213 L.Ed.2d at p. 413].)

Crucially, the right to keep and bear arms is not unlimited.  (*Heller, supra*, 554 U.S. at p. 595.)  However, the *Heller* majority concluded the prefatory clause in the Second Amendment — "A well regulated Militia, being necessary to the security of a free State" — was not a *limitation* on the individual right, but rather announced the *purpose* for which the right was enshrined in the Bill of Rights.  (*Id.* at p. 599.)  "The prefatory clause does not suggest that preserving the militia was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense and hunting.  But the threat that the new Federal Government would destroy the citizens' militia by taking away their arms was the reason that right — unlike some other English rights — was codified in a written Constitution." (*Ibid*.)

As stated, the right recognized in the Second Amendment is not unlimited. (*Heller, supra*, 554 U.S. at pp. 595, 626.)  The Second Amendment right to bear arms is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." (*Id*. at p. 626.)

On this point, the Supreme Court in *Heller* clarified that, in *United States v. Miller* (1939) 307 U.S. 174 (*Miller*), the basis for the court's conclusion that the Second Amendment did not apply to the 12-gauge short-barrel shotgun at issue in that case "was *not* that the defendants were 'bear[ing] arms' not 'for . . . military purposes' but for 'nonmilitary use,' [citation].  Rather, it was that the *type of weapon at issue* was not eligible for Second Amendment protection:  'In the absence of any evidence tending to show that the possession or use of a [short-barreled shotgun] at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we

15

cannot say that the Second Amendment guarantees the right to keep and bear *such an instrument*.' " (*Heller, supra*, 554 U.S. at p. 622, quoting *Miller*, at p. 178.)  The *Heller* majority further stated that "*Miller* stands only for the proposition that the Second Amendment right, whatever its nature, extends only to certain types of weapons." (*Heller*, at p. 623.)

The majority in *Heller* also considered certain language in the *Miller* opinion that addressed whether a short-barreled shotgun was "any part of the ordinary military equipment." (*Miller, supra*, 307 U.S. at p. 178.)  Placed in proper context, the majority in *Heller* stated that it read *Miller* "to say only that *the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns*." (*Heller, supra*, 554 U.S. at p. 625, italics added.)  The majority in *Heller* continued:  "*Miller* said, as we have explained, that the sorts of weapons protected were those 'in common use at the time.'  [Citation.]  We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.' " (*Id*. at p. 627.)

As to this historical tradition of prohibiting dangerous and unusual weapons, the *Heller* majority cited to a number of venerated authorities spanning roughly a century. (*Heller, supra*, 554 U.S. at p. 627.)  Blackstone's Commentaries stated that the offense of riding or going armed with dangerous or unusual weapons was a crime against the public peace.  (4 Blackstone, Commentaries 148-149.)  The Honourable James Wilson, discussing affrays — crimes against the personal safety of the citizens —stated that, "[i]n some cases, there may be an affray, where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner, as will naturally diffuse a terrour among the people." (Wilson, Works of the Honourable James Wilson (1804) p. 79, fn. omitted.)  Also discussing affrays, John A. Dunlap in 1815 stated that it is "said to be an affray, at common law, for a man to arm himself with dangerous and unusual weapons, in such manner as will naturally cause terror to the people." (Dunlap

16

The New-York Justice (1815) p. 8.)  In 1822, Charles Humphreys stated:  "Riding or going armed with dangerous or unusual weapons, is a crime against the public peace, by terrifying the people of the land . . . ."  (Humphreys, Compendium of the Common Law in Force in Kentucky (1822) p. 482.)  Humphreys noted that "it should be remembered, that in this country the constitution guaranties to all persons the right to bear arms; then it can only be a crime to exercise this right in such a manner, as to terrify the people unnecessarily."  (*Ibid*.)  In 1831, William Oldnall Russell stated:  "And granting that no bare words, in the judgment of law, carry in them so much terror as to amount to an affray, yet it seems certain that in some cases there may be an affray where there is no actual violence; as where persons arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people; which is said to have been always an offence at common law, and is strictly prohibited by several statutes." (Russell, A Treatise on Crimes and Indictable Misdemeanors (1831) p. 271.)  Henry J. Stephen in 1840 stated that riding or going armed with dangerous or unusual weapons was a misdemeanor.  (Stephen, Summary of the Criminal Law, 27 Law Libr. [i] (1840) p. 48.)  Ellis Lewis stated in 1848 that, "[n]o quarrelsome or threatening words whatever, can amount to an affray; but where persons openly arm themselves with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, an affray may be committed without actual violence." (Lewis, An Abridgment of the Criminal Law of the United States (1847) p. 64.)  And, in 1852, Francis Wharton stated:  "Although no bare words, in the judgment of law, carry therein so much terror as to amount to an affray, yet it seems certain that in some cases there may be an affray where there is no actual violence; as where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people, which is said to have been always an offence at common law, and is strictly prohibited by the statute." (Wharton, A Treatise on the Criminal Law of the United States (1852) p. 726.)  Wharton subsequently stated:  "It has

17

been said generally, that the public and open exhibition of dangerous weapons by an armed man, to the terror of good citizens, is a misdemeanor at common law." (*Id.* at p. 727.)

Following its citation to these authorities, the Supreme Court in *Heller* further observed: "It may be objected that if weapons that are most useful in military service — M-16 rifles and the like — may be banned, then the Second Amendment right is completely detached from the prefatory clause. But as we have said, the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty. It may well be true today that a militia, to be as effective as militias in the 18th century, would require sophisticated arms that are highly unusual in society at large. Indeed, it may be true that no amount of small arms could be useful against modern-day bombers and tanks. But the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right cannot change our interpretation of the right." (*Heller, supra*, 554 U.S. at pp. 627-628.)

D.     *Post-Heller Challenges to the Predecessor to Section 30605*

This case is not the first challenge to California's statute prohibiting possession of assault weapons this court has entertained since the United States Supreme Court decided *Heller*. In *People v. James* (2009) 174 Cal.App.4th 662 (*James*), this court upheld former section 12280, subdivision (b), which the Legislature subsequently repealed and replaced with section 30605 without substantive change (Stats. 2010, ch. 711, §§ 4, 6), as well as former section 12280, subdivision (c) which prohibited possession of .50-caliber BMG rifles. Before deciding the constitutionality of these provisions in the wake of *Heller*, the court extensively recounted the legislative history of the AWCA, largely derived from the California Supreme Court's decision in *Kasler, supra*, 23 Cal.4th at pages 482-488. (*James*, at pp. 667-673.) The *James* court summarized the purposes of the regulations at issue: "the Legislature enacted the Roberti-Roos Assault Weapons

18

Control Act of 1989 and the .50 Caliber BMG Regulation Act of 2004 in order to address the proliferation and use of unusually dangerous weapons: assault weapons, with an incredibly 'high rate of fire and capacity for firepower,' which can be used to indiscriminately 'kill and injure human beings' [citation]; and .50 caliber BMG rifles, which 'have such a high capacity for long distance and highly destructive firepower that they pose an unacceptable risk to the death and serious injury of human beings, destruction or serious damage of vital public and private buildings, civilian, police and military vehicles, power generation and transmission facilities, petrochemical production and storage facilities, and transportation infrastructure' [citation]." (*Id.* at pp. 673-674.)

After considering many of the same passages in *Heller* that we have set forth *ante*, the *James* court synthesized *Heller*'s teachings: "Accordingly, 'the right secured by the Second Amendment is not . . . a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.' [Citation.] Rather, it is the right to possess and carry weapons typically possessed by law-abiding citizens for lawful purposes such as self-defense. [Citation.] It protects the right to possess a handgun in one's home because handguns are a 'class of "arms" that is overwhelmingly chosen by American society' for the lawful purpose of self-defense." (*James, supra*, 174 Cal.App.4th at pp. 675-676, citing *Heller, supra*, 554 U.S. at pp. 626, 628-630.)

The *James* court concluded the statutes challenged on that appeal did not proscribe conduct protected by the Second Amendment as defined in *Heller*. (*James, supra*, 174 Cal.App.4th at p. 677.) In arriving at that conclusion, the *James* court stated: "As the court's discussion makes clear, the Second Amendment right does not protect possession of a military M-16 rifle. [Citation.] Likewise, it does not protect the right to possess assault weapons or .50 caliber BMG rifles. As we have already indicated, in enacting the Roberti-Roos Assault Weapons Control Act of 1989 and the .50 Caliber BMG Regulation Act of 2004, the Legislature was specifically concerned with the unusual and dangerous nature of these weapons. An assault weapon 'has such a high rate

of fire and capacity for firepower that its function as a legitimate sports or recreational firearm is substantially outweighed by the danger that it can be used to kill and injure human beings.' [Citation.] . . . These are not the types of weapons that are typically possessed by law-abiding citizens for lawful purposes such as sport hunting or self-defense; rather, these are weapons of war." (*Id*. at p. 676.) The *James* court further observed: "While the fully-automatic nature of a machine gun renders such a weapon arguably more dangerous and unusual than a semiautomatic assault weapon, that observation does not negate the fact that assault weapons, like machine guns, are not in common use by law-abiding citizens for lawful purposes and likewise fall within the category of dangerous and unusual weapons that the government can prohibit for individual use. . . . In any event, assault weapons and .50 caliber BMG rifles are at least as dangerous and unusual as the short-barreled shotgun at issue in *United States v. Miller, supra*, 307 U.S. 174." (*Id*. at pp. 676-677.) The *James* court neither discussed nor applied a means-scrutiny test as part of its analysis. (*Id*. at pp. 667-677.)

A few years after this court decided *James*, the defendant in *People v. Zondorak* (2013) 220 Cal.App.4th 829 (*Zondorak*) challenged former section 12280, subdivision (b) anew. The court in *Zondorak* surveyed the landscape, discussing *Heller* and *James*. (*Zondorak* at pp. 832-835.) The court concluded: "We agree with *James* that the ban on AK series rifles does not impinge on rights protected by the Second Amendment because assault weapons 'are at least as dangerous and unusual as the short-barreled shotgun' [citation], which *Miller* concluded (with apparent approval from *Heller*) was outside the scope of the Second Amendment's guarantee. [Citation.] Indeed, assault weapons are only slightly removed from M-16-type weapons that *Heller* likewise appeared to conclude were outside the scope of the Second Amendment's guarantee. Because we conclude the AWCA [ (§ 30500 et seq.) ] does not 'impose[ ] a burden on conduct falling within the scope of the Second Amendment's guarantee,' as construed by *Heller*, 'our

20

[Second Amendment] inquiry is complete' and an evaluation of the validity of the law under either strict scrutiny or intermediate scrutiny is unnecessary." (*Id*. at p. 836.)

E.  *Constitutional Challenges to Statutes Generally*

Before proceeding with the substance of our analysis, we note the approach courts are compelled to take in considering constitutional challenges to statutes. "A defendant challenging the constitutionality of a statute carries a heavy burden: 'The courts will presume a statute is constitutional unless its unconstitutionality clearly, positively, and unmistakably appears; all presumptions and intendments favor its validity.' " (*People v. Fuiava* (2012) 53 Cal.4th 622, 696, quoting *People v. Falsetta* (1999) 21 Cal.4th 903, 912-913; accord, *City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 10-11.) In other words, "[c]ourts should exercise judicial restraint in passing upon the acts of co-ordinate branches of government; the presumption is in favor of constitutionality, and the invalidity of the legislation must be clear before it can be declared unconstitutional." (*Dittus v. Cranston* (1959) 53 Cal.2d 284, 286.)

F.  *Analysis*

Applying the test originally established in *Heller* to California's statute prohibiting the possession of assault weapons, now set forth in section 30605, we again conclude the Second Amendment's plain text does not cover defendant's conduct. Assault weapons like the AR-15 style rifle police found in defendant's car, are, like the short-barreled shotgun addressed in *Miller, supra*, 307 U.S. 174, "weapons not typically possessed by law-abiding citizens for lawful purposes." (*Heller, supra*, 554 U.S. at p. 625.) Rather, these are dangerous and unusual weapons. These weapons have a great deal in common with the military M-16 rifle. As the Supreme Court has stated of such weapons, the "AR-15 is the civilian version of the military's M-16 rifle . . . ." (*Staples v. United States* (1994) 511 U.S. 600, 603; accord, *Zondorak, supra*, 220 Cal.App.4th at p. 836 ["assault weapons are only slightly removed from M-16-type weapons that *Heller* likewise appeared to conclude were outside the scope of the Second Amendment's guarantee"];

*Heller v. District of Columbia* (D.C. Cir. 2011) 670 F.3d 1244, 1263 ["it is difficult to draw meaningful distinctions between the AR-15 and the M-16"].)  As *James* concluded, the United States Supreme Court's discussion in *Heller* made clear that "the Second Amendment right does not protect possession of a military M-16 rifle."  (*James, supra*, 174 Cal.App.4th at p. 676, citing *Heller, supra*, 554 U.S. at pp. 626-628.)  And, further, as stated in *Zondorak* and *James*, the assault weapons that are the subject of section 30605, " 'are at least as dangerous and unusual as the short-barreled shotgun' [citation], which *Miller* concluded (with apparent approval from *Heller*) was outside the scope of the Second Amendment's guarantee."  (*Zondorak*, at p. 836, quoting *James*, at p. 677 & citing *James*, at pp. 674-675.)

In discussing circumstances at the time of the passage of the AWCA, the Supreme Court in *Kasler* noted that, according to the Attorney General, law enforcement did not at that time know how many assault weapons there were in California.  (*Kasler, supra*, 23 Cal.4th at p. 484.)  However, the numbers were " 'going up at a frightening rate.' " (*Ibid*.)  In Oakland, for example, the number of assault weapons seized by law enforcement had tripled in less than two years.  (*Ibid*.)  Conversely, in its comprehensive discussion of the legislative history and the circumstances at the time, the Supreme Court's majority opinion in *Kasler* did not once mention assault weapons being possessed for self-defense, let alone being in common use at the time for that purpose.  Only the concurring opinion of Justice Brown (who also penned the majority) referred to self-defense, and only in a historical context with no connection to assault weapons.  (*Id*. at p. 505 (conc. opn. of Brown, J.).)  This strongly suggests that there was no prevailing belief at the time that citizens commonly used assault weapons for the lawful purpose of self-defense.  (See *id*. at p. 485, quoting 1 Assem. J. (1989-1990 Reg. Sess.) p. 450 [discussing the testimony of Los Angeles Police Department Lieutenant Bruce Hagerty before the California State Assembly meeting as a Committee of the Whole on February 13, 1989, testifying about a Good Friday gang shooting with an AR-15 which

22

resulted in 14 people being shot, stating, " 'the military assault rifle is the vehicle that they used. [¶] . . . I'm here to tell you that there's only one reason that they use these weapons, and that is to kill people. They are weapons of war.' "].) Before signing the legislation, Governor Deukmejian stated: " ' "It's well known that some drug dealers and violent gang members are using assault-type weapons". . . . [¶] "In the face of such firepower, our state's courageous law enforcement officers need all the help that we can give them as they seek to preserve our public safety". . . .' " (*Kasler*, at pp. 486-487.) Indeed, a spokesman for the California Police Chiefs Association said neither the Senate Bill nor the Assembly Bill "went far enough." (*Id*. at p. 487.)

Moreover, while earlier versions of the bill generically defined the assault weapons to be banned, lawmakers amended the bill so as to avoid "ban[ning] some legitimate hunting rifles" in service of the effort to prohibit possession of assault weapons. (*Kasler, supra*, 23 Cal.4th at p. 485.) Instead of defining assault weapons generically, the amended, and subsequently enacted, version listed the specific weapons that were to be banned. (*Id*. at pp. 485-486.) Thus, the assault weapons that were the target of the act were not thought to be possessed by citizens for lawful purposes, whereas "legitimate hunting rifles" were excluded from the act's reach. If it was believed that certain weapons that otherwise might qualify as assault weapons were in common use for the lawful purpose of self-defense at the time, then certainly these weapons, like "legitimate hunting rifles," would have been excluded from the statute's reach. Instead, "in enacting the assault weapons control act, the Legislature sought to address 'the grave threat to public safety posed by the possession and use of assault weapons *by criminals* . . . .' "[5] (*James, supra*, 174 Cal.App.4th at p. 672, italics added, quoting *Kasler*, at p. 487.)

---

[5]     Specific instances illustrating the "crisis created by the proliferation and use of assault weapons" that was the subject of the California State Assembly meeting as a

23

That assault weapons such as defendant's AR-15 rifle are "weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns" (*Heller, supra*, 554 U.S. at p. 625) has not changed since the courts in *James* and *Zondorak* considered the issue. And because California's statute prohibiting the possession of assault weapons has been upheld and operative in the interim, by definition, and with exemptions that need not be discussed here, these weapons are not presently possessed by law-abiding citizens in California for lawful purposes.

We acknowledge, of course, that these weapons may be in common use in other jurisdictions. However, the scope of our concern is limited to California and the constitutionality of section 30605. And, in this regard, we note section 30605 and its predecessor have been upheld repeatedly over more than 30 years. We further note that, while it is but one jurisdiction, it is difficult to conceive of California as an "outlier" (see *Bruen, supra*, ___U.S. at pp.___, ___ [213 L.Ed.2d at p. 413, 438-439]) given

---

Committee of the Whole on February 13, 1989, were described at that meeting as repeated in *Kasler*. (*Kasler, supra*, 23 Cal.4th at p. 482.) In one instance, a shooting at Cleveland Elementary School in Stockton occurred the month before the meeting. (*Id*. at p. 483.) "While 300 pupils, mostly kindergartners through third graders, were enjoying their lunchtime recess, Patrick Purdy, who had placed plugs in his ears to dull the sounds of what he was about to do, drove up to the rear of the school and stepped out of his car carrying a Chinese-made semiautomatic AK-47. 'Impassively, Purdy squeezed the trigger of his rifle, then reloaded, raking the yard with at least 106 bullets. As children screamed in pain and fear, Purdy placed a 9-mm pistol to his head and killed himself. When the four-minute assault was over, five children, ages 6 to 9, were dead. One teacher and 29 pupils were wounded.' " (*Ibid*.)

Five years earlier, James Huberty entered a McDonald's location in San Ysidro armed with a nine-millimeter pistol, a 12-gauge shotgun, and a nine-millimeter semiautomatic rifle. (*Kasler, supra*, 23 Cal.4th at p. 483.) He told everyone to get on the floor and then walked around "calmly spraying gunfire." (*Ibid*.) After law enforcement killed Huberty, they entered and discovered the "carnage was clearly far worse than it would have been had Huberty not been armed with semiautomatic weapons. He fired hundreds of rounds. 'The gunfire was so heavy that police at first assumed that more than one gunman was inside. . . .' [Citation.] In all, of the 45 patrons in the restaurant, Huberty killed 21 and wounded 15 others." (*Ibid*.)

24

California's outsized population, economy, cultural influence, and, most importantly, its 30-year history and tradition of assault weapon regulation. Moreover, since the passage of the AWCA in 1989, several states have followed California's lead and passed laws banning assault weapons in at least some form, most recently in 2023. (See N.J. Stat. Ann. §§ 2C:39-1(w), 2C:39-5(f), 2C:58-5, 2C:58-12, 2C:58-13; Hawaii Rev. Stat. Ann. §§ 134-1, 134-4(e), 134-8; Conn. Gen. Stat. §§ 53-202a – 53-202o; Md. Code Ann., Crim. Law §§ 4-301 – 4-306; Mass. Gen. Laws Ann. ch. 140, §§ 121, 122, 123, 131M; N.Y. Penal Law §§ 265.00(22), 265.02(7), 265.10, 400.00(16-a); Del. Code Ann. tit. 11, § 1466; 720 Ill. Comp. Stats. Ann. 5/24-1(a)(11), (14)-(16), 5/24-1.9, 5/24-1.10.) The United States Congress did the same, enacting an assault weapons ban in 1994, although it had a 10-year sunset provision. (Former 18 U.S.C. § 922(v)-(w).)

Notwithstanding our consideration of the constitutionality of section 30605 generally, we note that " '[a] litigant can be heard to question the validity of a statute only when and in so far as it is applied to his disadvantage.' " (*Mt. San Jacinto Community College Dist. v. Superior Court* (2007) 40 Cal.4th 648, 664, quoting *Rindge Co. v. Los Angeles County* (1923) 262 U.S. 700, 709-710; see *Members of City Council of City of Los Angeles v. Taxpayers for Vincent* (1984) 466 U.S. 789, 797 ["a litigant only has standing to vindicate his own constitutional rights"].) "[G]iven that constitutional rights are generally personal," a defendant generally may not assert a constitutional claim on behalf of others. (*People v. Hazelton* (1996) 14 Cal.4th 101, 109.) "The rule is well established . . . that one will not be heard to attack a statute on grounds that are not shown to be applicable to himself and that a court will not consider every conceivable situation which might arise under the language of the statute and will not consider the question of constitutionality with reference to hypothetical situations." (*In re Cregler* (1961) 56 Cal.2d 308, 313, citing *United States v. Raines* (1960), 362 U.S. 17, 21-22, *People v. Perry* (1931) 212 Cal. 186, 193 & *People v. Naumcheff* (1952) 114 Cal.App.2d 278, 280; accord, *People v. Parker* (1973) 33 Cal.App.3d 842, 849 ["One to whom the application

of a statute is constitutional will not be heard to attack the statute on the ground that it might be unconstitutional when considered in other situations."].)  The general rule is that "constitutional adjudication requires a review of the application of a statute to the conduct of the party before the Court."  (*Members of City Council of City of Los Angeles v. Taxpayers for Vincent, supra,* 466 U.S. at p. 798.)  We turn, then, to the question of the constitutionality of section 30605 as applied to defendant.

Defendant here certainly was not acting as a law-abiding citizen who possessed his AR-15 rifle for lawful purposes.  Defendant drove from his home in San Jose to Vernon R.'s house in Manteca "loaded for bear" as the trial court put it at sentencing.  Defendant had three firearms with him, including the AR-15 style rifle.  It was a centerfire semiautomatic rifle with a flash suppressor, a pistol grip protruding from the bottom portion of the action, a magazine release button, and a telescoping buttstock.  Thus, the rifle was an assault weapon as defined in section 30515, subdivision (a)(1).  Officer Cardenas noted the AR-15 style rifle was stuck or jammed.  Officer Montero testified a firearm might make a clicking sound if it malfunctions or is empty.  Before shots were fired into the house, Vernon R. heard what he described as the clicking of a gun, specifying he heard at least a couple of clicks.  Defendant fired shots into Vernon R.'s house and possibly at Vernon R.  There was what appeared to be blood on the AR-15 as well as the revolver, suggesting at the least defendant touched it after returning to his car with blood on his hands and possibly that he had it with him during the incident and attempted to fire it.  After the incident, law enforcement and Vernon R. discovered the power to Vernon R.'s house had been cut.  Law enforcement and Vernon R. found bullet holes and bullets in Vernon R.'s house.  The United States Supreme Court has made clear the Second Amendment protects a law abiding citizen's right to possess a handgun for self-defense, whether in the home or outside the home.  (*Bruen, supra*, ___U.S. at p.___ [213 L.Ed.2d at p. 401], citing *Heller, supra*, 554 U.S. 570 & *McDonald, supra*, 561 U.S. 742.)  There is simply no interpretation of the facts

26

here that suggests defendant possessed the AR-15 rifle for self-defense at the relevant times, a fact defendant's appellate counsel conceded at oral argument.

Defendant relies extensively on *Bruen* in making his argument that section 30605 violates the Second Amendment.[6] *Bruen* did not analyze whether a particular type of firearm is protected under the Second Amendment. Rather, *Bruen* focused on whether New York's statutory public-carry licensing scheme violated the Second Amendment right to carry handguns publicly for self-defense. (*Bruen, supra*, ___U.S. at pp.___, ___ [213 L.Ed.2d at pp. 401, 405].) The Supreme Court in *Bruen* held: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.' " (*Id*. at p. ___ [213 L.Ed.2d at p. 405]; see *id*. at p.___ [ 213 L.Ed.2d at p. 409].) Defendant asserts that, because "no such historical tradition of regulating assault weapons exists, [defendant's] conviction for violating section 30605 must be reversed."

Defendant relies on *Bruen* and what he characterizes as its "newly articulated test" in asserting that section 30605 violates the Second Amendment. However, the Supreme Court in *Bruen* did not create a new test applicable to Second Amendment challenges to firearm regulations. Rather, the Supreme Court in *Bruen* clarified the contours of *Heller*. In its own words, the majority in *Bruen* discussed the "test that we set forth in *Heller* and apply today . . . ." (*Bruen, supra*, ___U.S. at p.___ [213 L.Ed.2d at p. 411].) Similarly,

---

**6** In his reply brief, defendant also relies on a number of advocacy-based law review articles, we give little weight to.

turning to the application of the test to the matter before it, the *Bruen* majority stated: "Having made the constitutional standard endorsed in *Heller* more explicit, we now apply that standard to New York's proper-cause requirement." (*Id.* at p.___ [213 L.Ed.2d at p. 414].) Thus, the majority in *Bruen* made explicitly clear that it was applying the test it initially set forth in *Heller*.

Like the Supreme Court in *Bruen*, here, we do no more than apply the test announced in *Heller*. Doing so, we conclude the Second Amendment's plain text does not cover defendant's conduct. This is exactly what the courts in *James* and *Zondorak* did. (*Zondorak, supra*, 220 Cal.App.4th at p. 836 [AWCA "does not 'impose[ ] a burden on conduct falling within the scope of the Second Amendment's guarantee,' as construed by *Heller*"]; *James, supra*, 174 Cal.App.4th at p. 677 ["We conclude that [former] section 12280, subdivisions (b) and (c), does not prohibit conduct protected by the Second Amendment to the United States Constitution as defined in *Heller, supra*, 554 U.S. [570]"].) And like those courts, we conclude the statute prohibiting possession of assault weapons does not violate the Second Amendment as construed by *Heller*.[7]

---

[7] Two days before oral argument, the Attorney General filed additional citations with the court. (*Delaware State Sportsmen's Assn., Inc. v. Delaware Dept. of Safety and Homeland Security* (D.Del., Mar. 27, 2023, No. CV 22-51-RGA) ___F.Supp.3d___ [2023 WL 2655150]; *Bevis v. City of Naperville, Illinois* (N.D.Ill., Feb. 17, 2023, No. 22 C 4775) ___F.Supp.3d___ [2023 WL 2077392]; *Ocean State Tactical, LLC v. State of Rhode Island* (D.R.I. Dec. 14, 2022, No. 22-CV-246 JJM-PAS) [2022 WL 17721175]; *Oregon Firearms Federation, Inc. v. Brown* (D.Or., Dec. 6, 2022, No 2:22-CV-01815-IM) ___F.Supp.3d___ [2022 WL 17454829].) These cases were all federal district court cases. " '[T]he decisions of federal district and circuit courts, although entitled to great weight, are not binding on state courts even as to issues of federal law.' " (*Felisilda v. FCA US LLC* (2020) 53 Cal.App.5th 486, 497; accord, *Caliber Paving Co., Inc. v. Rexford Realty & Management, Inc.* (2020) 54 Cal.App.5th 175, 186-187 [we are not bound by decisions of federal district courts and circuit courts of appeals].) Additionally, like both *Bruen* and *Heller*, the four cases cited as new authority were all civil matters involving a more generalized challenge to the laws at issue as opposed to defendant's challenge to the statute under which he stands convicted.

A significant clarification *Bruen* did make was that it forcefully rejected the second step of the two-part test that had been widely embraced in federal courts of appeal following *Heller*. That two-part test, rejected by the Supreme Court, was as follows: First, the government would attempt to justify a regulation by establishing it regulated activity falling outside the scope of the Second Amendment right based on its historical meaning, and, if the government failed to do so, then second, the court would engage in what the Supreme Court called a means-end scrutiny test. (*Bruen, supra*, ___U.S. at pp.___ [213 L.Ed.2d at pp. 405-406].) This means-end scrutiny test refers to familiar tests employing standards including strict scrutiny and intermediate scrutiny. (See *id*. at p.___ [213 L.Ed.2d at p. 406].) About this means-end scrutiny step of the analysis, the majority in *Bruen* stated: "Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history. But *Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context. Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." (*Ibid*.)

---

In addition to citing new authority, in the pre-oral-argument filing, the Attorney General stated, "at oral argument I intend to agree with appellant that a limited remand might be appropriate in this case (as suggested on pages 25-26 of the reply brief)." To the extent this, and the Attorney General's statements at oral argument, constitute a concession to the need for a limited remand for purposes of litigating the constitutionality of section 30605 in the trial court, we do not accept the concession. We see no impediment to our ability to decide the issues presented on the current record. Indeed, defendant's position concerning limited remand was only that, if we found the record insufficient to adjudicate his claim, we should conditionally reverse and remand for an evidentiary hearing. At oral argument, defendant's appellate counsel agreed the record was sufficient for us to make a determination on the merits, requesting that we "address all issues here today," and stated the matter need not be remanded for an evidentiary hearing in the trial court on the issue of "common use."

We specifically emphasize the fact that *Bruen* rejected this means-end scrutiny portion of the test for a reason. Neither *James* nor *Zondorak* relied on the means-end scrutiny component in rejecting constitutional challenges to the predecessor to section 30605. Therefore, these cases are not called into question based on *Bruen*'s rejection of the means-end scrutiny analysis.

To summarize, the courts in *Zondorak* and *James* concluded that California's statute prohibiting possession of assault weapons did not violate the Second Amendment as construed by *Heller, supra*, 554 U.S. 570. The United States Supreme Court in *Bruen*, in its own words, applied the "test that [it] set forth in *Heller* . . . ." (*Bruen, supra*, ___U.S. at p.___ [213 L.Ed.2d at p. 411]; see also *id*. at p.___ [213 L.Ed.2d at p. 414].) The *Zondorak* and *James* courts did not employ the means-end scrutiny test which the Supreme Court rejected in *Bruen*. (*Id*. at p.___ [ 213 L.Ed.2d at p. 406].) Specifically, the *James* court made no mention of such a test. The *Zondorak* court found it unnecessary to apply that test because it had concluded the challenged regulation "does not 'impose[ ] a burden on conduct falling within the scope of the Second Amendment's guarantee,' as construed by *Heller*," and therefore " 'our [Second Amendment] inquiry is complete . . . .' " (*Zondorak, supra*, 220 Cal.App.4th at p. 836.) We agree with the decisions in *Zondorak* and *James* upholding the statutory predecessor to section 30605 on the ground that assault weapons like the AR-15 style rifle police found in defendant's car, are "weapons not typically possessed by law-abiding citizens for lawful purposes" (*Heller*, at p. 625), and " 'are at least as dangerous and unusual as the short-barreled shotgun' [citation], which *Miller* concluded (with apparent approval from *Heller*) was outside the scope of the Second Amendment's guarantee." (*Zondorak*, at p. 836, quoting *James, supra*, 174 Cal.App.4th at p. 677 & citing *James*, at pp. 674-675.) In short, as did the courts in *James* and *Zondorak*, we conclude California's prohibition of possession of assault weapons, now at section 30605, does not violate the Second Amendment as construed by *Heller*. This is settled law.

DISPOSITION

Defendant's sentence is vacated, and the matter is remanded for full resentencing. Defendant's convictions are otherwise affirmed.

                                        \s\                    ,
                                        McADAM, J.*

We concur:

        \s\            ,
ROBIE, Acting P. J.

        \s\            ,
MAURO, J.

---

*        Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.